IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO TEACHERS UNION, AMERICAN FEDERATION OF TEACHERS NO. 1, | ) ) ) | |
| Plaintiff, | ) ) ) | No. 10 C 4852 |
| v. | ) ) | |
| BOARD OF EDUCATION OF THE CITY OF CHICAGO, and MARY RICHARDSON LOWERY, NORMAN BOBINS, TARIQ BUTT, ROXANNE WARD, PEGGY DAVIS, ALBERTO CARRERO, JR., and RON HUBERMAN, in their official capacities, | ) ) ) ) ) | JUDGE DAVID H. COAR |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Chicago Teachers Union (the "Teachers Union") has filed an action against Defendants Board of Education of the City of Chicago (the "Board"), and Mary Richardson Lowery, Norman Bobins, Tariq Butt, Roxanne Ward, Peggy Davis, Alberto Carrero, Jr., and Ron Huberman, in their official capacities, based on the Board's recent economic layoff of tenured teachers. In its five-count complaint, the Teachers Union alleges violations of federal due process (Counts I and II), the Contracts Clause of the United States Constitution (Count III), and state law governing reductions in force, 105 ILCS 5/34-18(31) (Count IV); the Teachers Union also seeks an injunction in aid of arbitration under state law (Count V).

On August 13, 2010, the Teachers Union filed a motion for a preliminary injunction on Counts I and II. In its motion, the Teachers Union seeks an order: (1) directing the Board to rescind the discharges of tenured teachers under the Board's June 15, 2010 resolution; (2)

directing the Board to provide a procedure for review and retention of such teachers under Section 504.2 of the Chicago Public Schools Policy Manual, Appendix H of the parties' collective bargaining agreement, or some equivalent procedure consistent with the requirements of *Mims v. Bd. of Educ. of City of Chi.*, 523 F.2d 711 (7th Cir. 1975); and (3) preliminarily and permanently enjoining the Board from conducting future layoffs or "honorable discharges" in a similarly unlawful manner.[1] On September 15, 2010, the Court held a hearing to simultaneously address the Union's motion for a preliminary injunction and its ultimate pursuit of a permanent injunction. After considering the parties' briefs and in-court arguments, the Court grants the Teachers Union's motion and enters preliminary and permanent injunctions against the Board for the reasons explained below.

**FACTUAL BACKGROUND**

The facts in this case are largely undisputed. Facing significant budget deficits on the eve of the 2010-2011 school year, the Board was forced to lay off nearly 1,300 teachers. The Board implemented its layoffs through a series of resolutions issued over the summer. On June 15, 2010, the Board passed a resolution authorizing the "honorable termination" of tenured teachers. (Compl. Ex. F.) The Board passed a second resolution on June 23, 2010, authorizing schools to first lay off teachers who were under remediation and whose last performance ratings were negative. (Compl. Ex. H). Although the Board suggested to the media that the entire layoff involved teachers with unsatisfactory evaluations, in fact, the majority of tenured teachers laid off were rated "excellent," "superior," or "satisfactory." (Compl. ¶¶ 43, 53-54, Ex. J, K; Mot. for Prelim. Inj. Ex. 1- Potter Decl. ¶ 18). On July 20, 2010, the Board announced plans to dismiss

---

[1] Because the relief sought by the Teachers Union is not entirely consistent across all of its briefs and oral arguments, the Court adopts the Union's characterization of its claims at the conclusion of its Reply Brief in support of its motion for a preliminary injunction. (Dkt. 45 at 8.)

400 teachers in "Track E" schools, the majority of whom were tenured. (*Id.* at ¶¶ 9-10.) The Board has since informed the Teachers Union of its intentions to terminate upwards of 1,500 more teachers.

Throughout the summer, the Board implemented layoffs of 1,289 teachers in sequential phases that ended by August 31, 2010. (Br. in Opp. to Prelim. Inj. Ex. A- Resnick Aff. ¶ 20). All laid-off teachers received notice of their termination. (*Id.*; Inj. Hr'g Tr. 36-37, Sept. 15, 2010.) They were not, however, provided with an opportunity to demonstrate their qualifications for retention in some capacity within the school system. (Potter Decl. ¶ 23.) Vacancies arise frequently throughout the Chicago Public Schools system; in a system that employs approximately 40,000 people, natural labor needs compel the Board to hire approximately 2,000 new teachers every year. (Resnick Decl. ¶ 4; Potter Decl. ¶ 21.) While the Board's notice to laid-off teachers directed them to a website listing job vacancies in the Chicago Public Schools system, the Board admits that there are many vacancies that principals never post on this website. (Hr'g Tr. 36-37.) Conceivably, laid-off teachers afforded retention or reassignment rights would have access to those vacancies.

Due to an increase in federal funding in August 2010, the Board was able to restore the positions of approximately 600 recently laid-off teachers before schools opened. (Resnick Aff. ¶¶ 23-24.)

## LEGAL STANDARD

"The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Vill. Of Gambell, AK*, 480 U.S. 531, 546 (1987).

To obtain a permanent injunction, the Teachers Union must demonstrate: (1) success on the merits; (2) that remedies available at law are inadequate;[2] (3) that the benefits of granting an injunction outweigh any resulting injury to the Board; and (4) that an injunction will not harm the public interest. *See Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003). Since the requirements for a preliminary and permanent injunction are essentially the same, but a permanent injunction carries a higher burden of proof, the Court will conduct the current analysis under the standard for obtaining a permanent injunction. *See Chi. Sch. Reform Bd. of Tr. v. Diversified Pharm. Serv., Inc.*, 40 F.Supp.2d 987, 991 (N.D. Ill. 1999).

## ANALYSIS

### I. Success on the Merits

To prevail on a claim for the deprivation of property without due process, a plaintiff must establish that she holds a property interest protected by the Fourteenth Amendment. *See Bd. of Regents v. Roth*, 408 U.S. 564, 576-77 (1972). Such property interests are not formed by the Constitution; "[r]ather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577; *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 539 (1985). An individual has a property interest in a benefit if he has more than an "abstract need" for, or "unilateral expectation" of, that

---

[2] When considering whether to grant injunctive relief, courts sometimes use "irreparable harm" synonymously with "inadequate remedy at law." The Seventh Circuit has cautioned against such "confusing usage," explaining:

> [W]hen, as in this case, the issue is whether to grant a permanent injunction, not whether to grant a temporary one, the burden is to show that damages are inadequate, not that the denial of the injunction will work irreparable harm. "Irreparable" in the injunction context means not rectifiable by the entry of a final judgment. It has nothing to do with whether to grant a permanent injunction, which, in the usual case anyway, *is* the final judgment.

*Walgreen Co. v. Sara Creek Property Co., B.V.*, 966 F.2d 273, 275 (7th Cir. 1992) (citations omitted).

benefit. *Roth*, 408 U.S. at 577. "He must, instead, have a legitimate claim of entitlement to it." *Id.*; *Perry v. Sinderman*, 408 U.S. 593, 602 (1972). Once a court determines that an individual holds a property interest protected by the Due Process Clause, the question becomes what process is due. *Loudermill*, 470 U.S. at 541.

The Teachers Union contends that tenured teachers laid off for economic reasons hold a due process right to some type of retention procedure before they are permanently discharged. In furtherance of this claim, the Union submits that tenured teachers subjected to economic layoffs have a property interest in their continued employment. The initial challenge lies in locating the basis for this property interest. According to the Teachers Union, the Illinois School Code contemplates two ways in which tenured teachers may be terminated. The first way, termination "for cause," requires a plethora of procedures, including notice and a hearing. *See* 105 ILCS 5/34-85; 105 ILCS 5/24A. As far as the Union is concerned, the second and only other way tenured teachers may be terminated is through layoffs conducted pursuant to 105 ILCS 5/34-18(31). Section 5/34-18(31) is included in the Illinois School Code section defining the Board's authority and describes one of the many powers afforded to the Board. It states:

> § 34-18. The board . . . shall have power:
> . . .
>
> 31. To promulgate rules establishing procedures governing the layoff or reduction in force of employees and the recall of such employees, including, but not limited to, criteria for such layoffs, reductions in force or recall rights of such employees and the weight to be given to any particular criterion. Such criteria shall take into account factors including, but not be limited to, qualifications, certifications, experience, performance ratings or evaluations, and any other factors relating to an employee's job performance;
> . . .

105 ILCS 5/34-18(31). The Teachers Union locates the property interest underlying its due process claim in this provision. According to the Teachers Union, Section 5/34-18(31) requires

the Board to consider teachers' "qualifications, certifications, experience, performance ratings or evaluations, and . . . job performance" when implementing layoff and recall procedures.

Initially, the Teachers Union argued that Section 5/34-18(31) entitles tenured teachers laid off for economic reasons to the layoff and recall procedures set forth in Appendix H of the parties' collective bargaining agreement. (Compl. Ex. C.) (Appendix H is mirrored in Section 504.2 of the Chicago Public Schools Policy Manual, which was also adopted as a Board rule. (Compl. Ex. D.))  Appendix H and Section 504.2 outline the only existing procedures for the layoff and retention of tenured teachers.  As part of these procedures, displaced teachers enter a "reassignment pool," where they receive full pay and benefits while applying for vacant positions.  Teachers may remain in the "reassignment pool," and on the payroll, for up to ten months.  Those who have not secured permanent positions after ten months are "honorably terminated."

The difficulty with the Teachers Union's argument for invoking Appendix H is that, on its face, Appendix H does not apply to broad-based economic layoffs.  Rather, Appendix H applies:

> Whenever an attendance center or program is closed, there is a drop in enrollment, the educational focus of the attendance center is changed such that available teaching positions cannot accommodate some or all current regularly certified and appointed teaching staff, or [due to the remediation, probation, or financial constraints of attendance centers].

(Compl. Ex. C.)  The Teachers Union argues that Appendix H applies in this case because all types of layoffs covered by Appendix H are "economic" in some sense.  (Hr'g Tr. 20-22.)  The Union suggests that the complete center closings contemplated by Appendix H logically include—and therefore apply to—the partial closings that led to layoffs here.  (*Id.*)  Nevertheless, apparently recognizing the imperfect fit between Appendix H and the situation at hand, the

Teachers Union retreats slightly from its initial position and argues that tenured teachers laid off for economic reasons are entitled to *either* the procedures delineated by Appendix H *or* some constitutionally equivalent procedure for retention or reassignment. At oral argument, the Teachers Union conceded that this procedure need not include a full-salaried, ten-month bridge between a tenured teacher's initial layoff and final discharge. (Hr'g Tr. 34-36.)

The Teachers Union finds legal support for its position in the Seventh Circuit's decision in *Mims v. Bd. of Educ. of City of Chi.*, 523 F.2d 711 (7th Cir. 1975). In *Mims*, the Board laid off several certified civil service employees due to a loss of federal funding. *Id.* at 713. When the Board received funding to hire temporary employees to help close down the discontinued programs, the Board selected all males. *Id.* at 714. The Board explained that the closing process involved physically demanding tasks, and males would be capable of the heavy lifting required, while females would not be. *Id.* at 714-15. Six females who were laid off filed suit, arguing that they had a due process right to an opportunity to demonstrate that they were qualified to perform the temporary work. *Id.* The Seventh Circuit agreed and concluded that "plaintiffs had a property interest in their continued active employment" without identifying the source of that right. *Id.* at 715. The court held specifically:

> We recognize that a layoff is less drastic than a discharge and may not require all the procedural safeguards necessary before termination through discharge. But we think that plaintiffs had a property interest in their continued active employment, not just in their status as civil servants. Plaintiffs at least were entitled to an opportunity to attempt to demonstrate that they were capable of performing the work assigned to the six temporary employees. The issue of whether plaintiffs could perform the work, unlike that of the need to cut back due to loss of federal funding, was one of which plaintiffs might have been able to contribute information and valid persuasion, possibly resulting in a temporary continuation of employment. . . . The defendant board failed in its duty to establish a procedure by which an employee could obtain review of a layoff decision to ensure that it was not for an impermissible reason or to demonstrate that he or she should have been retained, and failed to provide plaintiffs with the opportunity for such a review that due process requires.

*Id.* (citations omitted). The Teachers Union argues that, as in *Mims*, tenured teachers subjected to economic layoffs have a property interest in their continued employment and a right to demonstrate their qualifications for retention in some capacity.

The Board responds that *Mims* is distinguishable from the current situation. As the Board points out, *Mims* was decided twenty-five years ago and long before the enactment of Section 5/34-18(31). The Board argues that, unlike the statute applicable in *Mims*, Section 5/34-18(31) does not afford tenured teachers a property interest in continued employment or recall rights in the event of an economic layoff. Acknowledging that the Seventh Circuit in *Mims* did not identify the source of the plaintiffs' property rights, the Board surmises that their rights derived from a civil service statute unlike Section 5/34-18(31). Without identifying the statute in *Mims*, however, the Board is unable to explain exactly *how* that statute is meaningfully distinct from Section 5/34-18(31). Nonetheless, the Board insists that Section 5/34-18(31) does not create any property interest protected by the Due Process Clause. The Board goes on to conclude that, because they are not entitled to the procedures triggered by either "for cause" terminations, or the specific types of layoffs defined by Appendix H, tenured teachers hold no rights at all in the event of an economic layoff. (*See* Hr'g Tr. 7-8.)

The Board supports its position primarily by reference to *Shegog v. Bd. of Educ.*, No. 99 C 211, 2000 U.S. Dist. LEXIS 6099 (N.D. Ill. May 1, 2000) and *Land v. Bd. of Educ.*, 757 N.E.2d 912 (Ill. App. Ct. 2001), *rev'd in part on other grounds*, 781 N.E.2d 249 (Ill. 2002). The plaintiffs in *Shegog* were tenured Chicago Public Schools teachers who were laid off, received full salaries and benefits while they sought positions at other schools, and were unable to secure jobs within ten months. *See Shegog v. Bd. of Educ.*, 194 F.3d 836, 837 (7th Cir. 1999). At that point, they sued on due process grounds to halt their final termination. *See id.* On appeal, the

Seventh Circuit remanded the case to determine whether Section 5/34-18(31) or the Board's layoff policy created a property interest under the Due Process Clause. *See id.* at 839-40. On remand, the district court held that neither Section 5/34-18(31) nor the Board's layoff policy created a property interest in continued employment. *Shegog*, 2000 U.S. Dist. LEXIS 6099, at \*6-12. Similarly, in *Land*, the Illinois appellate court rejected the argument that Section 5/34-18(31) and the Board's layoff policy together endowed tenured teachers with a property interest in continued employment and rights to pre-layoff hearings. *Land*, 757 N.E.2d at 924-25. In reaching this conclusion, the court noted that layoffs are distinct from discharges "for cause," and while pre-termination hearings are constitutionally required for the latter, they are not required for the former. *See id.* at 925.

The problem with the cases cited by the Board is that neither squarely addresses the question at hand—whether Section 5/34-18(31) creates any type of property interest for tenured teachers in the event of an economic layoff. Certainly, the courts in *Shegog* and *Land* both used broad language announcing that Section 5/34-18(31) does not create a property interest in continued employment. However, these statements concerned factual scenarios quite distinct from the current case. Unlike the Teachers Union, the plaintiffs in *Shegog* and *Land* were not asserting due process rights to post-layoff opportunities to demonstrate their qualifications for vacant positions. Indeed, the plaintiffs in both cases were afforded retention procedures analogous to the procedure provided by Appendix H. Ultimately, neither these nor any other cases cited by the parties apply directly to the instant situation. Nor has the Court unearthed a more helpful case.

Setting aside the case law for a moment, the Court turns to the relevant state law and regulations in search of the property interest the Teachers Union asserts. At the outset, the Court

rejects the Union's argument that Appendix H of the parties' collective bargaining agreement or Section 504.2 of the Chicago Public Schools Policy Manual applies to tenured teachers subjected to economic layoffs. The Teachers Union's argument on this score is not unreasonable; as the Union points out, all types of layoffs defined by Appendix H (program closings, center closings and drops in enrollment) are economic layoffs to some extent. That said, Appendix H does not, on its face, apply to broad-based economic layoffs. And more importantly, the notion of *en masse* economic layoffs is inconsistent with Appendix H's retention procedure, which affords laid-off teachers ten months' salary and benefits while they apply for vacancies within the school system. The Court therefore concludes that neither Appendix H nor its embodiment in Section 504.2 apply in this case.

The question then becomes whether Section 5/34-18(31) alone creates a property interest and right to some sort of retention procedure. The Court holds that it does. This conclusion stems, in part, from the Court's inability to completely distinguish Section 5/34-18(31) from the statute considered in *Mims*. As stated above, *Mims* held that the plaintiffs had a property interest in their continued employment without identifying the source of that property interest. However, the court in *Mims* cited a case that sheds much light on the plaintiffs' property interest and provides useful guidance for this Court: *Powell v. Jones*, 305 N.E.2d 166 (Ill. 1973). In *Powell*, a class of certified civil service employees sued for pre-layoff hearings. To determine whether due process required such hearings, the Illinois Supreme Court extensively analyzed the civil service statute and related rules governing civil service employment—the very statute and rules that the Seventh Circuit neglected to mention in *Mims*. The *Powell* court explained that Section 8 of the Civil Service Commission Personnel Code authorized the director of personnel to promulgate rules "[f]or layoffs by reason of lack of funds or work, abolition of a position or

material change in duties or organization, and for reemployment of employees so laid off, giving consideration in both layoffs and reemployment to seniority and service." *Id.* at 267-68 (citing 127 ILCS 63b103b.13 (1967)) (internal quotation marks omitted). In addition to this statute, the court looked to the Personnel Department Rules and the Civil Service Commission Rules to determine whether the plaintiffs had a "legitimate claim of entitlement to continued employment." *Id.* at 170 (citing *Sinderman*, 408 U.S. at 602) (internal quotation marks omitted). The court's analysis revealed rules affording a plethora of rights to certified civil employees in the event of layoffs:

> Certified employees in a particular job situation may not be laid off until probationary, exempt, temporary, emergency and provisional employees have been. Then, certified employees are laid off in order of seniority. (Rule 2-570.) On a re-employment list after layoff the first available employment goes to the certified employee. (Rule 2-580.) A certified employee, if laid off, has the right to request a voluntary reduction in class. (Rule 2-530). A certified employee who is laid off maintains his continuous service status for a period of up to two years. (Rules 2-250, 2-590.) A certified employee has the right to petition the Director, within 15 days of receipt of layoff notice, for a reconsideration (Rule 2-596), and a right to request a hearing before the Civil Service Commission, which may consist of a staff investigation, or informal hearing, or formal hearing, on the validity of the layoff. (Article XII, Rules of the Civil Service Commission.) Other benefits which attach to the status of employee under the State personnel system include participation in a State employment retirement system and a State employees' group insurance system.

*Powell*, 305 N.E.2d at 170-171. Applying *Roth*, the court evaluated the due process protections provided by these rules in light of the employment expectancy they created. *Id.* at 171. Given the plaintiffs' pursuit of pre-layoff hearings, the critical question the court faced was whether about-to-be-laid-off employees were entitled to the same due process protections as about-to-be-discharged employees. *Id.* The Illinois Supreme Court held that they were not. Concluding that the plaintiffs were not constitutionally entitled to the same full hearings afforded to discharged employees, the court held that the procedures in place satisfied "due process standards when

- 11 -

considered in the context of the compelling interests of the State government in effecting personnel changes for reasons of economy and efficiency." *Id.* at 172.

*Powell* provides this Court with a better understanding of the property interest recognized in *Mims* as it relates to this case. Certainly, the statute and rules described in *Powell* (and relied on by *Mims*) afford laid-off employees a fully developed arsenal of rights, whereas Section 5/34-18(31) merely authorizes the creation of comparable rights. However, this observation does not doom the Teachers Union's case. Section 8 of the Civil Service Commission Personnel Code, the statutory basis for the rules promulgated in *Powell*, closely resembles Section 5/34-18(31). Both statutes authorize the creation of rules to govern layoff and recall procedures in the event of economic layoffs. And both statutes require these rules to account for considerations such as employees' seniority and service. The key difference is that, unlike in *Mims*/*Powell*, the Board here has failed to promulgate the rules envisioned by the legislature. That was a mistake on the Board's part, as Section 5/34-18(31) clearly contemplates rules to govern layoff and recall procedures.

In defiance of Section 5/34-18(31), the Board submits that the only difference between "laid-off" and "terminat ed" teachers is that laid-off teachers have the benefit of knowing that their termination was not "for cause." The Court rejects that position. In fact, the distinction between terminations and layoffs is more than just semantic; the Illinois School Code provides a separate set of rights for teachers discharged in each manner. Teachers terminated "for cause" are afforded a series of protections under 105 ILCS 5/34-85 and 105 ILCS 5/24A. Defining the cornerstone of these protections, Section 5/34-85 bars tenured teachers from removal except "for cause" and provides for notice and a hearing in the event of such a removal. In contrast, layoffs are governed by a separate statutory provision—Section 5/34-18(31)—which affords laid-off

employees a different set of rights. Section 5/34-18(31) provides that "[t]he board . . . shall have power . . . [t]o promulgate rules establishing procedures governing the layoff or reduction in force of employees and the recall of such employees." 105 ILCS 5/34-18(31). These rules must include considerations such as teachers "qualifications, certifications, experience, performance ratings or evaluations, and . . . job performance.." *Id.* While the Board never promulgated the rules contemplated by Section 5/34-18(31), the detailed rules in *Powell* shed light on the intended differences between schemes governing layoffs and terminations. *See Powell*, 305 N.E.2d at 170-171. Like the authorizing statute in *Powell*, Section 5/34-18(31) contemplates unique rights for laid-off, as opposed to terminated, employees.

Section 5/34-18(31) contemplates not only rights concerning layoffs, but rights concerning recall procedures as well. Although the statutory language "shall have the power" is admittedly ambiguous, the Board itself reads this language as imposing a mandatory obligation on the Board—at least in the context of conducting layoffs. When the Board passed its June 23, 2010 resolution to consider performance ratings and evaluations when making layoff decisions, the Board explained that this rule was "require[d]" by Section 5/34-18(31). (Compl. Ex. H.) Additionally, in briefs submitted to the Court, the Board has grounded its authority to conduct layoffs in Section 5/34-18(31). Despite the Board's myopic focus on layoffs, the language of Section 5/34-18(31) indicates that the Board's obligations concern both layoff *and* recall procedures. The Board suggests that, if the Teachers Union wanted retention procedures in the event of economic layoffs, it should have bargained for those procedures. That position, however, ignores the Board's statutory obligation to create such procedures, regardless of the parties' contractual agreements.

The Court concludes that Section 5/34-18(31) provides tenured teachers some residual property rights in the event of an economic layoff. The difficulty with this analysis is that, normally, state law rules and regulations create the property interest that defines a court's due process inquiry. *See Roth*, 408 U.S. at 577; *Powell*, 305 N.E.2d at 170-171. Here, there are no rules—only the statutory authorization/requirement for rules under 5/34-18(31). Without rules or regulations, the Court can do no more than read 5/34-18(31) as vaguely providing a property interest in some sort of retention procedure. The precise shape and dimensions of that property interest are unknown in the absence of rules. However, it would be odd to conclude that the Board could avoid the reach of the Due Process Clause by simply ignoring its statutory obligation to frame the property interest that the legislature says teachers possess. Because the Court lacks institutional competence to draft the missing rules and regulations, the Court orders the Board to promulgate, in consultation with the Teachers Union and after good-faith negotiation, a set of recall rules that complies with Section 5/34-18(31).

## II. Permanent Injunction Requirements

In addition to succeeding on the merits, the Teachers Union meets the other three requirements for obtaining a permanent injunction. The Union has demonstrated that there is no adequate remedy at law, that the balance of harms favors entry of an injunction, and that an injunction will not harm the public interest. *See Collins*, 349 F.3d at 374; *Walgreen Co.*, 966 F.2d at 275. As explained above, because the Teachers Union satisfies the requirements for obtaining a permanent injunction, it has demonstrated its entitlement to a preliminary injunction as well.

*First*, the Union successfully demonstrates that damages cannot provide adequate compensation for the harm suffered in this case. *See e360 Insight v. The Spamhaus Project*, 500 F.3d 594 (7th Cir. 2007). The Teachers Union seeks an opportunity for laid-off, tenured teachers to be considered for vacancies within the school system; it does not assert a right to the vacancies themselves. Because it is difficult—if not impossible—to place a price tag on the opportunity the Teachers Union seeks, the Court concludes that monetary damages cannot provide an adequate remedy in this situation.

*Second*, the balance of harms favors the entry of an injunction. As the Teachers Union submits, the Board will suffer no cognizable injury if it is required to implement a procedure for the retention of laid-off, tenured teachers. The Teachers Union is not asking the Board to restore the positions that have been eliminated. Rather, the Union requests a procedure that will give tenured teachers a foot in the door to be considered for existing vacancies. Because the Board would have to fill these vacancies anyway, the Court discerns no harm in the Board's consideration of laid-off, tenured teachers for these positions.

*Third*, the public interest will not be harmed by the entry of an injunction. The Court cannot conceive of any potential harm to the public that would result from the consideration of tenured teachers for existing vacancies in the event of an economic layoff.

## CONCLUSION

For the reasons stated above, the Teachers Union's motion for a preliminary injunction is GRANTED. The Court enters an order: (1) directing the Board to rescind the discharges of tenured teachers under the Board's June 15, 2010 resolution; (2) directing the Board to promulgate, in consultation with the Teachers Union and after good-faith negotiation, a set of

recall rules that complies with 105 ILCS 5/34-18(31) within the next 30 days; and (3) preliminarily and permanently enjoining the Board from conducting future layoffs or "honorable discharges" in a similarly unlawful manner, until such time as the recall rules have been promulgated.

    Enter:
/s/ David H. Coar

_____
David H. Coar
United States District Judge

**Dated:** October 4, 2010